So the first case on this part of the docket is United States v. Elsheikh. We'll hear from Mr. Compton first. I do want to note that on the representations of counsel we're conducting this in open court. We're depending on you not to discuss any classified information and if you feel that becomes a necessity you need to inform the court before you do. Are we agreed with that? All right, Mr. Compton. Thank you, Your Honor, and may it please the court, my name is Nicholas Compton and I, along with my colleague Aaron Moss, we represent the appellant in this case, Elsheikh Elsheikh. I'd like to reserve seven minutes for rebuttal, Your Honor, which I see that the clerk has done. Thank you. I think it goes without saying that the facts and circumstances of this case are very serious, dealing with, I think, perhaps the most grave and the most significant matters that our system of justice have to take on. And that's why we think it's so important that the system gets it right. Unfortunately, in several areas we think that the district judge in this case got it wrong. First, we believe that the district judge erred in denying Mr. Elsheikh's motion to suppress statements that he made to the FBI that were obtained through an impermissible two-step interrogation technique. Well, it's only impermissible if it fails either ELSTAT or Missouri v. Siebert. And we, Your Honor, believe that the correct standard is the Missouri v. Siebert case, which, as the court knows, an interrogator uses a deliberate strategy predicated upon violating Miranda during an extended interview, any post-warning statements that are related to the substance of the pre-warning statements must be excluded, absent any curative measures. And we believe we do have a deliberate strategy here. Do you agree that under Justice Kennedy's controlling opinion in Siebert and this court's subsequent interpretations, this is a two-step inquiry, as in you have to win Issue 1 and then the government has to not carry its burden on Issue 2? And if the government wins on either of those two questions, the government wins. Do you agree that we've said that? I agree, Your Honor, and that's my understanding. And do you agree that Judge Ellis said that you lose on both of those? That's my understanding. Well, the reason I ask that is because your brief seems to collapse the two of them. My sense is that Judge Ellis first makes a finding. This is not a two-step interrogation. And then he says, even if it was, the ameliorative measures were here. And your brief seems to challenge the second, but I'm not sure where in your brief you really challenged Judge Ellis' finding on the first issue, that this wasn't a deliberate two-step interrogation. And if you haven't challenged that, isn't that just it? I believe that would be it, sir. But I do believe that we have raised that issue. Well, it's one thing to note the issue. It's something else to actually argue it. So why don't you tell us, in response to Judge Hyten's question, where this was actually argued, particularly in your brief? I think, Your Honor, in our reference to the – actually, a couple of areas. In reference to the courses of action that were noted in the email between, I believe it was FBI Agent Nutter that he had sent to Agent Chiappone, they laid out three courses of action there, which we believe demonstrate that this two-step process was by design. They each start with this notion that any downplay of rights, that any Miranda rights should be downplayed. And I understand that that also goes to curative measures, but I believe that that also reflects a design here, that this is how we've set this up. We are coming in after the combined DOD-FBI intelligence interviews, and we are going to downplay those rights in order that Mr. Elsheikh – Well, they didn't seem to do a very good job of that, because they went through a fairly detailed Miranda explanation. I believe Mr. Elsheikh, after the FBI agent said that we're starting anew, he asked, what do you mean we're starting anew? He read the Miranda statement himself. I understand what you're saying, that this was a possibility, but tell us in actuality from what happened, how that occurred. Well, I think one example of that, Your Honor, is one of the courses of action, for example, is make him believe that he is not a main player in all this, so that he might divulge more. In fact, that's actually what happens when they are referred to as the Beatles, and the government seems to make a distinction, or they did, that one was John or Paul, one was George at some point. Elsheikh always seemed to be Ringo, and I think the common, perhaps, understanding is that John and Paul are the main folks of the Beatles, Ringo more the laughing stock of the four, and that's exactly what happened when they questioned Mr. Elsheikh. He then divulges, whether he meant to or not, that Mr. Amwazi was the lead guy. He was the one doing all the really bad stuff.  Can I ask you a question that I wasn't able to figure out the answer to? So one of the things that Judge Ellis, you have a fair, there's a sense in your brief, and perhaps it's a fair sense, that Judge Ellis essentially resolved every single factual dispute against you, and in the way most favorable to the government, and in the way least favorable to your client. And that's sort of a theme that echoes throughout your brief. But one of the things that Judge Ellis notes is that the government called witnesses who testified, who testified in front of Judge Ellis, and who were cross-examined by you, and one of the things he notes over and over again is that your client submitted a declaration but did not testify. Would your client have been able to testify? Is there any reason your client would not have been able to testify at these suppression hearings? I would say, Your Honor, I would... Let me ask you the first question. Would it have been, there may be good reasons why his attorneys would have not wanted him to do that, but is there any legal, he wasn't being held sort of outside the United States in a place he couldn't have testified, right? He was not, Your Honor. I don't believe there was any physical or legal reason that... As in, if his attorneys had said, in support of our suppression motion, we call our client and expose him to cross-examination by the government, you could have done that? I believe so, Your Honor. I would note... Not you, I'm sorry, his lawyers. I'm not suggesting it was you. Right. We weren't the counsel below... So what's wrong with the district court judge saying, look, I have to decide who I believe? And on one side, I have people who took the stand, looked me in the eye, exposed themselves to hostile questions from the party from the other side. And on the other hand, I have a written declaration by a person who is not taking the oath, exposing themselves to questions, allowing me to evaluate their credibility, exposing them to cross-examine. Why isn't it totally reasonable for a district judge to say, you know, when in doubt, I'm going to believe the people who I had a chance to look in the eye and the other side had a chance to cross-examine over the person that didn't give the other side that chance? And I certainly understand that position, Your Honor. But if I was there, I think I could also... One of the things as perhaps a trial counsel I might consider is that, well, I know, for example, that I believe some of the statements that Mr. Cote may have made that corroborated some of the issues that Mr. Elsheikh had made seem to be completely disregarded by Judge Ellis. That corroboration, except in, for example, instances where the two met, seemed to favor the government. Did Cote testify? I'm sorry, Your Honor? Did Cote testify at this trial? I don't believe that he did, Your Honor. The government I know was there. My reading of the transcript was that he was not, but I confess that the transcript is quite thick. But regardless, his statements that he made were introduced and they did on many instances comport with what Elsheikh was saying, which would, I would think, give credibility to his statement, even though he did not testify. Can I go back to the first Siebert question? Have we ever said, do you know, is that a finding of fact? So, again, as I understand Siebert and the way this Court has interpreted it, question one is did they intentionally employ a two-step process? Step two is emulator of measures. Is step one the question about whether the government intentionally deployed the two-step strategy? Do you think that's a finding of fact? A question of fact, I guess. I think the Court would, yes, Your Honor. So then isn't it subject to clear error review? Well, I think it is, Your Honor. So in other words, for us to rule in your favor, we would have to hold that Judge Ellis clearly erred in holding this was not an intentional use of a two-step interrogation. And we believe that he did, yes, Your Honor. We believe that, I don't disagree that there may be some evidence to support his ruling. But I think if this Court looks at the overall, the totality of the circumstances, if you will, with regard to that first question, not only the courses of action, not only the fact that there was an FBI agent sort of embedded with the DOD agent, and El Sheikh at one point sort of said, you know, who do you work for? And the response was, well, I'm DOD. Well, is that, how true is that? Yes, he was embedded with the DOD and he was there, but he was really FBI. And that's where we get this sort of hybrid process here. So then, okay, so let's assume you can somehow get over step one. So on step two, how don't you have, well, there's the Quice problem, but I think there's a bigger problem. I mean, Justice Kennedy and Siebert basically says, one way that you could make this okay is if you say, nothing you said before can be used against you. And here they said, nothing you said before can be used against you. Why doesn't that just ballgame on question two? Well, because, Your Honor, I think that that was actually, and I think that some of the testimony that Judge Ellis took indicates that that was actually presented rather vaguely to Mr. Elsheikh, that the difference between these intelligence interviews that he had been engaged in 20 years ago. But there's a line in the form that literally says, it's likely that nothing you've said before could ever be admitted against you in a criminal trial. There's a line in the form that just says that. A form, Your Honor, that they had indicated in three courses of action that they were going to be downplaying. You have that. You have the fact that, again, when you consider these totality of the circumstances, Mr. Elsheikh is a combatant taken off the field in a war zone in Syria in a SDF makeshift prison. He's in the custody of the- But that's not really different than Qais, is it? I'm sorry, Your Honor? That's not really different than Qais or however you pronounce our prior decision. Except one was in Iraq. The other was in Syria. I don't think, I mean, I don't think that- I'm sorry, Your Honor, my time has expired. Well, we've asked you a lot of questions, and I'm going to give you an extra two minutes on the opening, particularly in case you want to address any of your other issues because you hadn't got to anything else. Yes, Your Honor. And I think the court has adequately covered the first issue. We also think the district court erred in admitting statements Elsheikh made to the media. In May 2019, August- In August 2019, we believe that those were involuntary and self-exculpatory statements that were procured by coercive activity. Under Abu Ali, the court must consider, again, the totality of the circumstances and taking into account the characteristics of the accused, details of the interrogation, and again- What's your best authority as to whether the concept of- applies to what happened at the SDM facility? I would probably have to say that I don't have that- I'm not aware of that authority offhand, Your Honor. I don't- He was subject- The other provisions of the Constitution, including Miranda warnings, I don't see why this would not- But the Miranda warnings, aren't they related to conduct of United States officials? So that makes sense why that would happen. My question is, as I understand it, maybe I have it wrong here, that this claim relates to things that happened while he was under the custody of the SDM. I'm sorry, and I understand the court's question now. I believe- I think because in our interpretation that the U.S. forces- I don't know that the word condone is correct, but it seems that they were at least aware of what was going on as part of the questioning of them. They knew that there were torture issues going on. I believe something called a Combat Operational Stress Control Group. He was aware of physical abuse. Cameramen there were aware of physical abuse. And again, I think we're in a unique situation where he was in SDF custody, but I mean, I think for all intents and purposes, he was with the Americans. And the Americans were directing, ultimately, what happened to him. Do you have any closing comments for your opening argument? Because we've let you run over some. Yes, sir. I know I have some rebuttal time. So we had the two other issues. I know we briefed those for the court. I can address the rest if necessary in the rebuttal time. All right. Thank you very much. Thank you, Your Honor. Mr. Grano-Mikkelson? Did I get that right? You did. All right, sir. Good morning, Your Honors. May it please the court, Aiden Grano-Mikkelson for the United States. I'm joined at counsel's table by Raj Parikh, another Assistant U.S. Attorney at the Eastern District of Virginia. Unless the court would like me to start in a specific place, I'm happy to go in the order that my friend on the other side did and begin with the Siebert versus Elstad analysis. What do you think is the easier way to resolve that? The easiest way, Your Honor, is that the defendant waived his challenge to the intent component of Siebert and, therefore, were in the universe of Elstad. And the defendant also did not challenge the voluntariness of the statements under the Elstad standard with respect to the FBI statement. And so I think because that whole issue was waived at both of those stages of the analysis, that disposes of the FBI interrogation. Well, we had to choose between the other than waiver. We had to choose between the first step and the second step. What's your recommendation? Your Honor, I think this can be addressed at the first step, which is what this court did in Mashburn. There is no evidence that this was part of a deliberate plan to undermine the effectiveness of the Miranda warnings. In fact, I would argue that the uniform testimony of the witnesses at trial was that extensive steps were taken in order to preserve the efficacy of the Miranda warnings at the stage of the law enforcement interviews. So I think the district court's finding that there was no intent to undermine the defendant's constitutional rights is unassailable, particularly under a clear error standard, and I would urge the court. What is the government's view on that coerced media interview question? Because I agree with Judge Quattlebaum, it's a little strange to say coercion by non-state actors in a country other than the United States can create evidence whose admission in U.S. courts violates the Fifth Amendment. It may not be weird as an abstract matter, but I guess in light of the fact that it's black-letter law that coercion by private actors can't violate the Fifth Amendment, it seems a little strange to say coercion by non-state actors outside the United States can generate evidence that violates the Fifth Amendment. Can we just assume for the sake of argument that it can? How would you recommend we resolve that issue? Your Honor, it is an extremely challenging issue. Courts have split on that. There was some briefing done below, particularly by the defendant, on whether we use a voluntariness standard or a shocks-the-conscience standard, and that comes from the divide in both academic scholarship and among certain courts who have held that even if we don't apply the normal due process voluntary rules because of Connolly and the requirement of state action, there is something inherently offensive to the American system of justice. Which would be equally true if it was a purely private actor, too. Correct. And so there is this sort of super standard of it shocks the conscience that we might apply in those situations in order to... I'm still having trouble making sense. So private actors could do something that would shock the conscience, and we wouldn't be talking about this. Yes, Your Honor. It seems to me there has got to be a connection link. The courts that have justified it, and I don't want to speak for the United States government that this is the correct interpretation, but the courts who have applied a shock-the-conscience standard have said that the nexus comes at the point at which the testimony is admitted to the court. Then the court becomes a party to the conduct that happened overseas, and if it rises past a certain level of agreement, it's the court. If we assume that a due process analysis of some type applies here, what evidence is there in the record of any coercive activity by these private actors other than Mr. El-Sheikh's statement? There are two, I would say two sort of, I hesitate to call them corroboration pieces of evidence, but there are two other sources that a defendant has cited regularly. One are the unsworn statements of Mr. Cote in a debriefing with the United States government prior to Mr. El-Sheikh's trial that the government then provided to defense as part of our disclosure obligations. Mr. Cote was not called as a witness at the suppression hearing, and he was not called as a witness by either party at trial. So it is just the government's report of Mr. Cote's statements in a debriefing. The other is, I believe, a document filed as part of a DOD intake process when Mr. Cote and Mr. El-Sheikh were brought into United States custody after being with the SDF. Mr. El-Sheikh reported sort of similar allegations of abuse that had happened, and that report made it into an intake report from DOD. So those are really, again, mostly just Mr. El-Sheikh's unilateral allegations and then sort of the unsworn, unverified, out-of-court statements by Mr. Cote, which in some circumstances suggested he was also subject to physical mistreatment and in other cases contradicted instances of Mr. El-Sheikh's claims. Do you know any story for the proposition that I think Judge Ellis sort of said and that I was talking about with your colleague on the other side, that it's permissible for a district court in deciding how to resolve a factual dispute that one side called witnesses who testified, and I could look at them, and they could be cross-examined, and the other side submitted unsworn declarations? I was trying to think if I know any case that just expressly says it's perfectly okay for you to do that. Do you know of one? No, I don't, Your Honor, and I looked for one. The difficulty is I think the search terms are so common that it's difficult to pull it off. That was the difficulty I had, too. Yes. So, no, I looked for one to see. It seems correct as a matter of common sense, and, you know, we can cite everything to Justice Scalia's pay-on in favor of cross-examination as the great engine of truth-finding in American society. But you don't, I mean, you don't, it doesn't have to be from your standpoint on that basis alone. I mean, it's a clear error of view, and you've identified some error of coercion that came from the defendants, but there was evidence of the lack of coercion there. So even if we disregard the affidavit versus live testimony, it's still a clear error of view, right? Especially given the fact that the district court expressly grounded its findings in credibility determinations of the live witness testimony, even if you didn't compare it to, you know, the relative trustworthiness of a declaration versus live testimony. The government flew in three members of the Syrian Defense Forces with specific authority over the defendant during the time of his attention to testify about conditions, reporting mechanisms for abuse, their own personal interactions with the defendant during that time. Can I, I don't mean to cut you off there, but if I could shift you to the last argument that the defendant made, which is the routine booking exception argument. Yes, Your Honor. I have kind of the flip side of the coin about the use, the complaints about a not, you know, a foreign country's action with the notion that you used a, you know, So, same question. Do you have any authority of using what happens not in a U.S. prison facility but in other countries to apply that rule? No, Your Honor. This, as far as I understand, would be a question of first impression about applying the routine booking question exception to conduct committed by U.S. personnel but overseas where the custodial entity is a, well, in this case, a foreign sort of paramilitary organization. Because the DOD personnel were the ones conducting the enrollment process, we think that there is still some, there is that nexus that happens. And the justifications for the routine booking exception are still in place. There were administrative reasons. We essentially were performing an administrative function for the SDF. If it applies, is there a difference here? I mean, doesn't, you know, I mean, doesn't the, and maybe I'm not understanding the rule correctly, but if the questions are routine booking questions, but the very nature of those questions would be incriminating, you know, that seems to run afoul of our case that it at least talks about it. Usually that's not the situation. Usually it's not those statements that are inherently incriminating. But here, given the identity issues, it seems like by their nature, they're going to be incriminating themselves just in that situation. Does the booking exception still apply if those questions are inherently incriminating? So I'll address that in two parts, if I may. First on the legal standard. This court has actually declined to decide in Danjiu whether booking questions that are also potentially meet the incriminating standard would still fall under the exception. Other circuits have looked at it and said basically it's a contextual analysis. I would point the court's attention to Maryland v. King in 2013, where the Supreme Court said that the booking questions have to be reasonably related to an administrative purpose. And to me, the fact that they said even though the Fifth Amendment isn't normally subject to a reasonableness requirement, if routine booking questions have a reasonable relationship to an administrative purpose, and I think that would sort of, if I can use a Fourth Amendment analogy, go hand in hand with something like the independent source doctrine or independent discovery, where if we could ask these questions anyway, the fact that they turn out to be incriminating in a particular case might not be dispositive. The question under Innis is whether the questions were being asked with a reasonable foreseeability of eliciting incriminating information. Do you have a harmless error argument if that's, if I think those are going a bit too far or at least assuming they're going too far? I do, Your Honor. I think the harmlessness in this case is extremely strong. In these situations, the incriminating admissions, if you were to assume their incriminating nature, don't go to any offense conduct. They don't go to specific elements. They go, at most, to consciousness of guilt. Because this is lying about who he is and lying about, I mean, none of these are really being offered for the truth. They're actually being offered because they're lies. Exactly, Your Honor, and so in this case, particularly where the majority of the government state case in chief was testifying to the actual offense conduct, which was then unchallenged by defendant in his case and in his closings, and then our point. So did the, when they were doing this intake, did the Department of Defense folks take fingerprints? So even without Mr. Elchik saying who he was in truth, the fingerprints would have told them anyway, wouldn't it? That is actually how they found out his identity, even though he provided false information, is they also took fingerprints. And I believe it was something like a 2008 visit to the United States resulted in Mr. Elchik's fingerprints being in an immigration database. And that's what returned his real identity, at which point the DOD went back to confront him and he admitted his true identity. So yes, his identity would have been discovered anyway. And on that point, for Judge Cottlebaum's question, I would go back to the analysis from California v. Byers and Hibble, where the Supreme Court says, in only the most unusual circumstances is identity itself going to be proof of the crime, which is what we look at for the standard of whether or not it's going to be incriminating. In most cases, we do just have to identify who we've detained and who we are going to criminally prosecute. So can I ask you about forfeiture by wrongdoing, which in particularly one instance, at least, I mean, I have not had a ton of exposure, fortunately, to the forfeiture by wrongdoing exception to the rule against hearsay. But, you know, at least in a couple of these instances, and unfortunately there's no way to sort of talk about this issue without alluding to some of the facts, but in particular, you know, it's the classic forfeiture by wrongdoing question that I remember being taught by law school is the fairly obvious and intuitive one, which is a person intentionally takes an act to ensure that someone can't testify for the precise purpose. And this doesn't even have to be physical harm. It could be, you know, confederate of mine. It would be really great if you went to Argentina next week, and here's a plane ticket to Argentina, which just so happens will ensure that you're not present for the trial at which you would give testimony that would be very bad for me. So that's pretty straightforward when the showing is that you did the act for the specific purpose of ensuring that the person can't testify. But I don't read the district court as adopting that with regard to all the statements here. And, in fact, I think with regard to some of the statements here, it would be candidly kind of hard to find that level of specific intent. Can you just sort of walk me through how you think we should analyze it in a case where it's not the showing is you specifically did the thing for the express purpose of ensuring the person doesn't testify? So I think the first answer, Your Honor, is I don't think the intent has to flow all the way to specific statements. I think the intent has to be to procure the person's unavailability. Sure, but to prevent them from testifying, to prevent them from testifying in general. And not just testifying, but we know from Giles v. California that it also includes cooperating with or supporting a law enforcement investigation. So this would be communicating to law enforcement. So the cops would like to talk to you tomorrow, so here's a plane ticket to Argentina to make sure. Right, so it doesn't have to be related to a specific proceeding. It is just unavailability to assist with law enforcement later. So the only issue on the forfeiture by wrongdoing, as I understand the arguments, is on this intent element. Because I don't think anybody can raise a serious argument on the rendering the witnesses unavailable after they've been beheaded. So tell us precisely the best intent arguments that you have. I think the best evidence, frankly, is the Black Friday incident in which the Beatles executed a Russian hostage specifically to frighten the remaining hostages with respect to cooperating with law enforcement once they leave. They said that a Spanish hostage, Marcos Marginitis, had been released and then cooperated with Spanish law enforcement. So they removed a Russian hostage from the environment and brought back and forced the hostages to look at a photo of his executed body and said this is what will happen to the rest. And they videotaped some of those things, too. They videotaped the execution of a Syrian prisoner. Yes, and I think in conjunction, I'm sorry, Your Honor. Running low. I'm still good. They also devoted such attention to detail with secrecy. They always wore gloves. They always had masks. They forced the hostages to turn around and face the wall every time they entered the room. Hostages were beaten for looking them in the face even though they wore full balaclavas. Can I, I mean, just to play devil's advocate, the problem with that is that all to me not only is consistent with but suggests if you knew for certain that the person was never, ever, ever going to speak to law enforcement, there would be no need to conceal your identity from them. All of these efforts to conceal your identity seem to reflect a fear that this person might actually speak to authorities at some point. And I think that goes to the other component of the hostage-taking scheme which was that they were attempting to ransom these individuals. So there wasn't necessarily a categorical intent to kill everyone there in all circumstances. They were going to release some of them for ransom and so they were taking these actions. But when ransom was not forthcoming, which is the situation with the hostages as to whom the government advanced the forfeiture by wrongdoing exception, when no ransom was forthcoming and these individuals were not ransomed, rather than release them, rather than simply dissolve the hostage-taking operation and go away, the Beatles then took specific steps to procure their unavailability in all circumstances. And this court held in Jackson that it doesn't have to be the sole purpose or even the predominant purpose for the procuring of unavailability to be motivated by a desire to prevent the person from... Am I right that the government also has a harmlessness argument on this? Yes, Your Honor. Could you walk me through that? Yes, Your Honor. The harmlessness argument in this case is that... That if any of the forfeiture by wrongdoing evidence was wrongfully admitted, that error is harmless because... Because, Your Honor, in most cases, the evidence that we introduced that were statements from hostages were things like their ransom letters, which were relevant and probative of the fact that they had been taken hostage, their captors were demanding ransom, things like this. Again, these are things that were undisputed by the defendant at trial. His only challenge was to the identity. He was not one of the Beatles. And none of the statements from the hostages was used to prove his identity? There were a couple statements in which one of the deceased hostages testified that he too had heard Ringo refer to being arrested outside of the pub, which matches facts related to El Sheikh. However, we had independent testimony from surviving hostages of that same recollection and that same fact. So those statements... But that's the closest of something that... Exactly. Those would have been cumulative of perfectly admissible evidence otherwise. What else you got for us? Unless the court has any further questions, I'm happy to rest on the remainder of our briefing. Thank you very much, Mr. Compton. You've got some rebuttal time. Thank you, Your Honor. With regard to the booking exception, I think the court's question about the fingerprints I think is sort of spot on in that the purpose of this biometric enrollment, apparently according to the government, was to put these people into a system so that they knew who was there. Well, if that could be apparently accomplished by fingerprints, then what is the other point of asking all of these additional questions which go beyond, again, what is normally asked? They're not asking Mr. El Sheikh what his eye color is. They're not interested in how tall he is or what his weight is. They're wanting to know, well, you know, what are your language capabilities? What do you know about people like Kote? What do you know about Kote's language capabilities? What do you know about where he's from and what's going on? Those questions seem to go beyond what is necessary just to enroll this guy in a biometric system so that we know who. But what about the government's argument? The question isn't whether it's necessary in an absolute sense. I rather suspect that if we observed a booking process at a typical police station, we could come to the conclusion that some of the questions they ask are not literally necessary. That if you say, like, if I were to say to them, why is it necessary for you to ask each and every one of these questions? I suspect that many intake processes would not succeed. So the government says the standard is reasonably necessary. Why isn't that the right standard and why does this not meet that? Again, I don't think those questions are reasonably necessary to what we would call book somebody. They go beyond what is necessary for what the courts consider a booking to prepare someone for pretrial services or to get their necessary background information to log them in for a marshal service or whatever. So what is your response to the government's argument that even if that was an error, it's harmless? Well, I think it's under USB Laverne. The question is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict. And the government would say why is evidence that your client lied about his identity that was then swiftly uncovered, why does that relate to the verdict? The question isn't whether he wasn't prosecuted for lying when he was detained. He was prosecuted for doing the things that he was found by the jury to have done. And it sounds like the defense at trial was he is not in fact the person who did those things. Reasonable defense, if you could make it out. But why does the fact that he lied about who he was when he was booked have any really particular relationship to the question of whether he was in fact like we know who he is, the question is whether who he is is the person who did these other things. Why does that relate to whether he lied about who he was when he was booked? Well, my understanding, Your Honor of Laverne, is that it is contributing to the verdict. So I don't know that it necessarily has to relate to a specific, well, I wouldn't say a specific element in the terms of well, that fact goes there. If they're using it for consciousness of guilt, if they've made an effort to argue it strenuously in their own initial motion, if they raise it in closing argument. But that can't be right because no error would ever be harmful. The government introduces evidence because the government thinks that evidence is good for them. And we don't say there can't be harmless error any time the government  Isn't there an issue that, I mean, let's just imagine that wasn't, evidence never came in. And would that really undermine the ability of reasonable inquiry as to whether the jury would still find reasonable doubt? Isn't that kind of how we look at it? I think, Your Honor, the government bears that burden of showing that if... And they just pointed, I don't disagree, but they just said why that was the case. And, I mean, it sounds like your argument and response is, well, this helped them. And I think that's fair, as Judge Hyten says, but just because it helps them doesn't mean that if you assume that evidence wasn't there, you wouldn't look at the record and say a jury's still finding reasonable doubt. Well, I... I mean, guilt beyond reasonable doubt. I agree, Your Honor, but I think that when we're looking, about whether the error was harmless or not, I mean, if we're going to say the error was harmless, we can say, well, it was an error, but it didn't have any impact. I think the question here is that the government has to prove that it wasn't there. And, clearly, they think that it does at the lower level because they went through all of the effort. It was presented, and I don't see that they have offered up any indication that had this come out, that a jury may not have found that he is guilty. If a jury was perhaps, a juror was perhaps, you know, basing their decision on, well, you know, I'm not sure what this here, but he lied about who he was, and so I wasn't sure, I'm not sure about who he was, but he lied about it, so that must mean he's guilty. If a juror based their decision on that, and the government hasn't offered, I think, any other evidence beyond a reasonable doubt... Well, that's the point. They say they have this mountain of evidence. If you take this one piece out, which was helpful to them, but it was combined with a bunch of other stuff, a jury would still find your client's guilty beyond a reasonable doubt, and that's normally what they do. They point to all the other evidence, and if it's thin evidence, and something is central, you know, that's a harder argument. It sounds like your argument is anytime there's helpful evidence, there's a chance that a juror might have found that the key to the case, and how would we ever have harmless error? And I understand that, Your Honor, and I understand the court's position. I guess our position is... I don't have a position, I'm just trying to understand the argument. Yes, sir, yes, sir. Our position, I think, is that if you're offering consciousness of guilt, that that is a key factor, a key consideration that you're offering up, and I think the evidence to support that is the fact that... I'm sorry, my time is up. Finish answering. I think the evidence to support that is the fact that it was the government themselves that brought this to the court's attention through their own motion. It was the government's argument at closing that reiterated that to the jurors. I have one question about a topic that you all didn't get to. There's a section in the brief about a motion of limine for certain of the ISIS slavery documents and the testimony of Jane Doe, but in looking at the brief, I only see two sentences that are fairly conclusory. Have you waived that argument? I don't believe, I don't think that we've waived it, Your Honor. I also, just as an aside, I disagree that we've waived any voluntariness on the Miranda issue. But with regard to that, I think I will concede that that's probably our weakest of the arguments that we've made. But I think that what we are arguing there, and I think it has been raised, frankly, by what we've suggested, is that there are some relevancy issues there under 401, 402. We believe the district court made an error on that, and we believe that the weight goes to, even if the court was able to find some relevance, that the balancing clearly weighs in favor of exclusion. All right. Any closing statement you want to make? I think the court has covered all of the issues that we've raised, and so I appreciate the court's time. All right. Thank you very much. Thank you. We will come down and greet counsel and then move on to our next case.
judges: G. Steven Agee, A. Marvin Quattlebaum Jr., Toby J. Heytens